*Decision will be entered under Rule 50.*

ESTATE OF MOSES L. PARSHELSKY, DECEASED, LAWRENCE A. BAKER, CLARENCE G. BACHRACH, ISIDORE SCHWARTZ AND ABRAHAM PARSHELSKY, EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70212. Filed September 15, 1960.

*Lawrence A. Baker, Esq.*, for the petitioners.
*Clarence P. Brazill, Jr., Esq.*, for the respondent.

OPINION.

Opper, *Judge:* The issue here is somewhat narrowed by respondent's concession, which is substantiated by the facts, that the transactions above described met the requirements for a nontaxable reorganization [1] except for the absence of a valid business purpose under the rule of *Gregory* v. *Helvering*, 293 U.S. 465.

The *Gregory* decision turned on the meaning of the term "reorganization" as used in the revenue act, the Court saying that the statute speaks of a transfer made:

"in pursuance of a plan of reorganization" * * * § 112(g) * * * of *corporate business;* * * * [Emphasis added.]

as distinguished from:

an operation having no *business or corporate* purpose * * * [Emphasis added.]

Later in *Bazley* v. *Commissioner*, 331 U.S. 737, 741–742, the Court emphasized this restrictive meaning of the term "reorganization" as used in section 112(g), saying:

In a series of cases this Court has withheld the benefits of the reorganization provision in situations which might have satisfied provisions of the section treated as inert language, because they were not reorganizations of the kind with which § 112, in its purpose and particulars, concerns itself. See *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U.S. 462; *Gregory* v. *Helvering*, 293 U.S. 465; *Le Tulle* v. *Scofield*, 308 U.S. 415.

*     *     *     *     *     *     *

What is controlling is that a new arrangement intrinsically partake of the elements of reorganization which underlie the Congressional exemption and *not merely give the appearance of it to accomplish a distribution of earnings. In the case of a corporation which has undistributed earnings,* the creation of new corporate obligations which are transferred to stockholders in relation to their former holdings, so as to produce, for all practical purposes, *the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity* because cast in the form of a recapitalization-reorganization.

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS. [I.R.C. 1939].
    (g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b)(10) and subsection (1)) and in section 113 (other than subsection (a)(22))—
       (1) The term "reorganization" means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *

The governing legal rule can hardly be stated more narrowly. To attempt to do so would only challenge astuteness in evading it. And so it is hard to escape the conclusion that whether in a particular case a paper recapitalization is no more than an admissible attempt to avoid the consequences of an outright distribution of earnings turns on details of corporate affairs * * * [Emphasis added.]

The term "business purpose" as related to reorganizations may not be any more capable of exact delineation than the term "reorganization" itself. But the concept of "purpose" now firmly embedded in the statement of the principle cannot be too far separated from "motive" or "intention." And in any event, we think that the requisite business purpose must be one relating to the business being carried on by the corporation,[2] or relating otherwise to the corporation's organization or functioning and not one arising from and serving only the personal or noncorporate-business interests of the stockholders.

Section 112(b)(11) was added[3] to the 1939 Code by section 317 of the Revenue Act of 1951. A statement from the report of the Senate Finance Committee accompanying the bill is set out below.[4] Further light on the history of the section is found in the statement contained in 96 Cong. Rec. 1980 (1950).[5]

---

[2] Not "a transfer of assets by one corporation to another in pursuance of a plan *having no relation to the business of either.*" *Gregory* v. *Helvering, supra* at 469. (Emphasis added.)

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

  (b) EXCHANGES SOLELY IN KIND.—

      *        *        *        *        *        *

    (11) DISTRIBUTION OF STOCK NOT IN LIQUIDATION.—If there is distributed, in pursuance of a plan of reorganization, to a shareholder of a corporation which is a party to the reorganization, stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder of stock, no gain to the distributee from the receipt of such stock shall be recognized unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of earnings and profits to the shareholders of any corporation a party to the reorganization.

[4] "Section 317 of your committee's bill adds a new section 112(b)(11) of the code to provide for the nonrecognition of gain from the receipt of stock in corporate exchanges carrying out transactions known as spin-offs. * * *

"This section has been included in the bill because your committee believes that it is economically unsound to impede spin-offs which break-up businesses into a greater number of enterprises, when undertaken for legitimate business purposes. * * *" (S. Rept. No. 781, 82d Cong., 1st Sess., p. 57; 1951–2 C.B. 453, 499.)

[5] Mr. CAMP [sponsor of the bill in the House]. * * *

"Section 126, distribution of stock on reorganization: This section of the bill provides for the nonrecognition of gain from the receipt of stock in certain corporate reorganizations known as 'spin-offs.' A typical 'spin-off' occurs where a part of the assets of the corporation is transferred to a new corporation in exchange for all the stock of the new corporation which is thereupon distributed to the stockholders of the original corporation without the surrender by them of any of the stock of the original corporation.

"A similar provision was contained in section 112(g) of the Revenue Act of 1932 and prior acts but this was omitted in the Revenue Act of 1934 because the decision of the Board of Tax Appeals in Evelyn F. Gregory (27 B.T.A. 223 (1932)) indicated that

The facts here are simple. The distributing corporation, Brothers, was operating a long-established and prosperous lumber and mill-work jobbing business. Its sole owner, the decedent, was of advanced age and was concerned chiefly with getting his personal affairs in order for his possible retirement and settlement of his estate.[6] The corporation had a large accumulated surplus, and had paid section 102 surtax in several years. Among its many valuable assets was the real estate on which the business was being conducted. The decedent wanted this real estate separated from the going business of the corporation. The reasons advanced by witnesses at the trial were settlement of his estate and the removal of the real estate from the hazards of the business, should it be continued after his death. To that end he had the real estate transferred to a newly created corporation, Realties, in exchange for Realties' stock and had the stock all distributed to himself. Thereafter, Realties leased the real estate back to Brothers and the business continued as before.

While technically, as agreed, this was a distribution pursuant to a statutory reorganization, we can perceive in it no possible purpose to benefit the corporate business. To the contrary, it left the corporation without a valuable asset, the real estate on which the business was being conducted; and burdened with an annual rental charge of $42,000—far in excess of the amount of the 102 tax, see *Adam A. Adams, infra*—for carrying on a business that in the current year yielded a profit of less than $20,000. Although the real estate was eliminated from corporate assets, there remained upward of a million dollars in other property, including more than three-quarters of a million in cash and Government securities, which could have been seized by such imaginary creditors as might suddenly and unexpectedly appear. The same result would have been

---

such provision might be subject to abuse and held to apply to what was regarded as in substance the distribution of a dividend. The reversal of that decision in 69 F. (2d) 809 (CCA2, 1934), affirmed 293 U.S. 465 (1935), removed the danger of such abuse. Judicial and administrative interpretation of the law since 1934 has established safeguards which now prevent such abuse of the reorganization provisions. It is proposed to restore this provision to the law because it is believed that it is economically unsound to impede reorganizations which divide one corporate enterprise into a greater number of corporate enterprises where such division is undertaken *for legitimate business purposes and is not a mere device for the distribution of a dividend.* Where stock of a new corporation is distributed without the surrender of stock of the old corporation, the result is identical, in substance, with transactions in which stock of the new corporation is distributed in exchange for the surrender of either all or a portion of the stock of the old corporation—transactions which give rise to no recognized gain under present law. It is not intended to change the existing law as to such transactions but to amend the law so as to permit in the future the same substantial result to be accomplished with the same tax consequences by a 'spin-off' reorganization, *all three types of reorganizations being subject to the general limitations embodied in the Gregory case and subsequent decisions based thereon."* (Emphasis added.)

[6] Petitioners' brief phrases it that "[w]hat taxpayer intended to do was 'put his house in order' and so arrange the affairs of the corporations that, upon the happening of his retirement or death, those taking over would be on notice with, respect to the manner in which the corporate assets were to be treated." (Pets'. reply brief, pp. 13, 14.)

reached by a distribution of the real estate directly to the sole stockholder. We must assume that decedent was advised by his tax attorney that this would result in a tax on the value of the realty as a distribution.[7]

Actually then, the reorganization, in the words of the statute, was "used principally as a device for the distribution of earnings and profits." We know that these accumulated earnings were large, that they were beyond the reasonable needs of the business, but that decedent could not lay his hands on them without payment of an additional tax, and that he must have been aware of all these factors. Avoiding this tax is the only purpose which, on this record, we can ascribe to the transaction. Certainly petitioner has not carried the burden of showing the contrary. And this, of course, is not enough. *Gregory* v. *Helvering, supra.* The new corporation, Realties, was not intended to engage in the active conduct of any separate related business such as in the example [8] given in the Commissioner's regulations (T.D. 5990, approved Feb. 17, 1953, amending Regs. 111, sec. 29.112(b)(11)–2).

The same result was reached in *Perry E. Bondy*, 30 T.C. 1037. That case, it is true, was reversed by the Court of Appeals for the Fourth Circuit, 269 F. 2d 463. But as the following quotation (p. 466) will show, there was no difference of opinion as to the legal principles involved and the reversal was based purely on the reviewing court's interpretation of the facts:

For the exception of 112(b)(11) to apply, it must be conceded, the reorganization has to be germane to *the business of the corporation. Gregory* v. *Helvering*, 1935, 293 U.S. 465, 469 * * *

But the facts already recited and uncontroverted flatly refute the Commissioner's position. They positively affirm that the preservation of the dealership was the centerpiece of the reorganization. The reorganization was

---

[7] "One does not have to pursue the motives behind actions, even in the more ascertainable forms of purpose, to find, as did the Tax Court, that the whole arrangement took this form instead of an outright distribution of cash or debentures, because the latter would undoubtedly have been taxable income whereas what was done could, with a show of reason, claim the shelter of the immunity of a recapitalization-reorganization." (*Bazley* v. *Commissioner, supra* at 742–743.)

[8] "*Example 2.* Corporation C owns and operates a department store. It decides to provide parking facilities for the customers of the store. In order to provide such facilities, Corporation C enters into a contract to purchase land adjacent to its premises. The purchase price of the land is $100,000 and it is estimated that the cost of developing the parking lot will be $50,000. In order to separate the operations of the parking lot from those of the department store, Corporation C transfers to a newly formed Corporation D $90,000 in cash and $90,000 in bonds, together with the contract for the purchase of the land, in exchange for all the stock of Corporation D, which stock is distributed *pro rata* among the shareholders of Corporation C. The purchase of the land is completed on the date fixed in the contract, and the parking facilities are developed and operated by Corporation D. There are no other relevant facts. The transfer of the cash, bonds, and contract to Corporation D in exchange for its stock is a reorganization under section 112(g)(1) and the distribution of stock (other than preferred stock) in Corporation D to the shareholders of Corporation C is within the terms of section 112(b)(11)." (T.D. 5990, 1953–1 C.B. 142, 144.)

not dependent on the separation agreement or a divorce; it had a value to Market Motors irrespective of either. * * * [Emphasis added.]

It is immaterial that the distribution was of the stock of the subsidiary corporation, and thus, as a practical matter, of the real estate rather than of cash or other liquid assets. As we said in *Adam A. Adams*, 5 T.C. 351, 357, affd. 331 U.S. 737,

a distribution of the corporation's debentures can partake of the nature of a taxable dividend to the same extent as any other distribution of property or of the stock of a wholly different corporation.

We find no error in the determination.
Reviewed by the Court.

*Decision will be entered for the respondent.*