VAHLSING CHRISTINA CORPORATION FORMERLY THE CHRISTINA CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vahlsing Christina Corp. v. Commissioner
Docket No. 8571-73.
United States Tax Court
T.C. Memo 1985-273; 1985 Tax Ct. Memo LEXIS 358; 50 T.C.M. (CCH) 75; T.C.M. (RIA) 85273; June 6, 1985. Roy S. Kaneda, for the petitioner. Eugene J. Wien, for the respondent. FEATHERSTON MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes and additions to tax for the fiscal years ended June 30, 1963 through June 30, 1967: Addition
Sec. 6651(a),
Taxable Year Ended
Deficiency
I.R.C. 1954
June 30, 1963
$ 1,360.04
$ 136.00
June 30, 1964
$ 17,225.22
$1,722.53
June 30, 1965
$233,691.68
June 30, 1666
$217,388.52
June 30, 1967
$561,489.17
*362 The petition as filed raised a multitude of issues. All of them have been settled by agreement except two: 1. Whether the transfer by petitioner of 122,000 shares of Texas Plastics, Inc., stock to Texas Plastics, Inc., on August 29, 1966, in exchange for $419,680 was a redemption of stock "essentially equivalent to a dividend" within the meaning of section 302(b)(1) [1] and thus taxable to petitioner under section 301. 2. Whether petitioner is liable for the personal holding company tax under section 541 equal to 70 percent of its undistributed personal holding company income for the taxable year ended June 30, 1967. FINDINGS OF FACT Vahlsing Christina Corporation (formerly The Christina Corp.) is a corporation organized under the laws of Maine. It filed its Federal income tax returns for the taxable year ended June 30, 1963, with the District Director for Manhattan, New York, and for the other years in dispute with the District Director for Newark, New Jersey. For many years prior to 1962, the Vahlsing family was engaged, through a large number of *363 corporations, in far-flung agricultural and related operations in Idaho, California, Texas, Maine, New Jersey, and New York. These operations included not only the production of farm crops but also the production and marketing of fertilizers and insecticides, construction work, cold storage facilities, and other endeavors. During the fiscal years June 30, 1964 through June 30, 1967, the stock of these numerous corporations was owned mainly by Fred H. Vahlsing, Sr., Josephine M. Vahlsing, his wife, or, after her death, her estate, and Fred H. Vahlsing, Jr. Beginning at least as early as 1963, the Vahlsing family decided to reduce the number of their family corporations. Eventually, the number of family corporations was reduced from 26 to four or five. Texas Plastics, Inc. (hereinafter Texas Plastics), one of the Vahlsing family corporations, was incorporated in 1944 under the laws of Texas. In 1962, it made an unsuccessful public offering of its stock. On July 25, 1966, Texas Plastics had only one class of stock, common voting, outstanding. Although it had authorized the issuance of 1,000,000 shares, it had issued only 345,583 shares at that time and they were owned as follows: *364 Vahlsing Foundation, Inc. [1]
5,691    Albert Pfaffenroth
2,500    Clifford Spatz
500    Margaret Schenk [1]
12,500    Petitioner
99,797-1/3
F.H. Vahlsing, Inc. (Texas)
197,000-2/3
Texas Plastics (treasury)
27,594    Total issued common stock
345,583    Disregarding the treasury shares, F.H. Vahlsing, Inc. (Texas) and petitioner thus together owned 93.00 percent of Texas Plastics' outstanding stock. F.H. Vahlsing, Inc. (Texas), was wholly owned by petitioner during the period from June 17, 1966 through June 30, 1967. On July 24, 1966, the board of directors of F.H. Vahlsing, Inc. (Texas), authorized the sale to petitioner of its 197,000-2/3 shares of Texas Plastics for a total price of $677,682.29. The resolution authorizing the sale includes the following: It was the opinion of the Directors that the sale of this stock to * * * [petitioner] would be a further step in consolidating the entire ownership of Texas Plastics in the hands of * * * [petitioner] *365 and thereby a further step in simplifying the overall stock ownership of the Vahlsing companies. The minutes on the resolution adopted July 25, 1966, authorizing petitioner's purchase of the Texas Plastics stock reflect a statement by F.H. Vahlsing, Jr., who presided at the meeting, that the purchase "was desirable in order to simplify the stock ownership of the various Vahlsing companies" and to eliminate "a situation where a subsidiary of The Christina Corporation [petitioner] did itself own stock of another related family company." On July 26, 1966, the sale was completed and the shares were transferred to petitioner. As a result of this sale, petitioner became the owner of 296,798, or 93.33 percent of Texas Plastics' outstanding stock. Immediately prior to July 25, 1966, Texas Plastics owned 490,000 shares and Fred H. Vahlsing, Sr., owned 35,000 shares of the total number of 525,000 shares of the issued and outstanding stock of Texas Ploymer Corp. (hereinafter Texas Polymer). On July 25, 1966, Texas Plastics sold its 490,000 shares of Texas Polymer stock to petitioner for $490,000. On August 28, 1966, the board of directors of Texas Plastics adopted a resolution *366 authorizing the purchase from petitioner of 122,000 shares of Texas Plastics' own stock at $3.44 per share or an aggregate amount of $419,680. F.H. Vahlsing, Jr., who presided at the meeting, "suggested that it would be wise for the corporation [Plastics] to purchase shares of its own stock to be held in the treasury of the corporation for possible future needs." On August 29, 1966, the board of directors of petitioner authorized the sale of the 122,000 shares of Texas Plastics' stock for $3.44 per share or an aggregate of $419,680. On August 29, 1966, Texas Plastics paid petitioner the $419,680. As of August 29, 1966, Texas Plastics' stock was held as follows: Vahlsing Foundation, Inc.
$5,691
Albert Pfaffenroth
2,500
Clifford Spatz
500
Margaret Schenk
12,500
Petitioner
174,798
Plastics (treasury)
149,594
Total issued common stock
345,583
Disregarding the treasury shares, petitioner thus owned 89.19 percent of Texas Plastics' outstanding stock as of that date. On June 30, 1967, F.H. Vahlsing, Inc. (Texas), was merged into The Christina Corp., and the name of the surviving corporation was Vahlsing Christina Corp., petitioner herein. *367 At the time of the merger, The Christina Corp. owned all of the stock of the merged company. The minutes of Christina on the merger include the following: The Chairman stated that he believed this offer was to the benefit of the corporation since it would result in the entire ownership of the corporation being in the hands of The Christina Corporation, and thereby a further step in simplifying the overall ownership of the Vahlsing companies. * * * On July 7, 1967, the board of directors of Texas Plastics voted to merge with Texas Polymer as of July 31, 1967. On July 25, 1967, Texas Plastics, Inc.'s, stockholders approved the merger in accordance with the terms of the Plan of Merger. On the same date, the board of directors of Texas Polymer adopted a resolution approving a plan of merger of Texas Polymer into Texas Plastics. The resolution states that-- the "terms and conditions of such merger, the mode of carrying the same into effect, and the manner of exchanging the shares of stock of the corporation [Texas Polymer] for shares of stock of Texas Plastics, Inc., shall be as set forth in the proposed Plan of Merger submitted to this meeting." On July 25, 1967, the *368 merger was approved at a special meeting of the shareholders of Texas Plastics and at a special meeting of the shareholders of Texas Polymer. The plan of merger provided that Texas Plastics' outstanding stock would not "be changed or converted as a result of the merger" and would continue to be issued and outstanding stock of the surviving corporation.Texas Polymer's stock would be converted into stock of the surviving corporation on the basis of one share of Texas Polymer stock for .235 of a share of the surviving corporation's stock. The merger was completed on July 31, 1967. Following the merger on July 31, 1967, the stock of Texas Plastics, the surviving corporation, was owned as follows: Vahlsing Foundation, Inc.
5,691
Albert Pfaffenroth
2,500
Clifford Spatz
500
Margaret Schenk
12,500
Petitioner
289,948
Fred H. Vahlsing, Sr.
8,225
Plastics (treasury)
26,219
Total issued common stock
345,583
On August 2, 1967, petitioner purchased the remaining 26,219 shares of Texas Plastics' treasury stock from Texas Plastics for $90,193.36. Between October 1968 and February 1969, a second public offering of Texas Plastics' stock was made and additional *369 capital of some $3,000,000 was raised. OPINION At issue is whether petitioner's transfer on Auguat 29, 1966, of 122,000 shares of Texas Plastics stock to Texas Plastics in exchange for $419,680 was a redemption of stock "essentially equivalent to a dividend" within the meaning of section 302(b)(1), and thus taxable to petitioner as ordinary dividend income under sections 302(d) and 301(c) as determined by respondent; or whether the transaction should be considered merely one transitory, nontaxable step as part of the statutory merger between Texas Plastics and Texas Polymer qualifying as a tax-free reorganization under section 368(a)(1)(A), as urged by petitioner. Our conclusion with respect to the taxability of this transaction will determine whether petitioner is liable for the personal holding company tax under section 541. For the reasons discussed below, we sustain respondent's determinations that petitioner is taxable with ordinary dividend income on the transaction at issue and that petitioner is liable for the personal holding company tax under section 541. Section 317(b) provides that "stock shall be treated as redeemed by a corporation if the corporation *370 acquires its stock * * * in exchange for property." Under section 317(a), the term "property" includes money. [2] Respondent contends that because Texas Plastics acquired 122,000 shares of its stock in exchange for the $419,680 payment to petitioner, such transaction should be treated as a redemption. The tax consequences of a redemption of stock are governed by section 302. [3] Subsection (a) of that section, as in effect for 1967, the year in which the transaction at issue took place, provides that a stock redemption shall be treated as an exchange, and thus eligible for capital gains rather than ordinary income treatment, *371 if it falls into any one of the four following categories: (1) a redemption that is "not essentially equivalent to a dividend" under section 302(b)(1); (2) a "substantially disproportionate" redemption under section 302(b)(2); (3) a redemption of all of the shareholder's stock under section 302(b)(3); and (4) a redemption of the stock of certain railroad corporations under section 302(b)(4). *372 Neither party argues that Texas Plastics' redemption of 122,000 shares of its stock from petitioner in exchange for a $419,680 cash payment on August 29, 1966, falls within categories (2), (3), or (4). The issue is with respect to category (1): Whether the redemption payment by Texas Plastics to petitioner was "essentially equivalent to a dividend." Whether a distribution is essentially equivalent to a dividend under section 302(b)(1) "depends upon the facts and circumstances of each case." Sec. 1.302-2(b), Income Tax Regs. To qualify for capital gain treatment under section 302(a), the redemption under section 302(b)(1) "must result in a meaningful reduction of the shareholder's proportionate interest." UnitedStates v. Davis,397 U.S. 301, 313 (1970); Metzger Trust v. Commissioner,693 F.2d 459, 467 (5th Cir. 1982), affg. 76 T.C. 42 (1981); Coates Trust v. Commissioner,480 F.2d 468, 474 (9th Cir. 1973), affg. 55 T.C. 501 (1970). As disclosed in our findings, prior to the redemption of the 122,000 shares of Texas Plastics stock, petitioner, on August 29, 1966, held 296,798, or 93.33 *373 percent, of the 317,989 outstanding shares of Texas Plastics. After the redemption, petitioner, on August 29, 1966, held 174,798, or 89.19 percent, of the 195,989 shares that remained outstanding. This small decrease in petitioner's stock holding could not properly be described as a "meaningful reduction." Petitioner's control of Texas Plastics was unaltered. Friend v. United States,345 F.2d 761, 764 (1st Cir. 1965); Benjamin v. Commissioner,66 T.C. 1084, 1108-1109 (1976), affd. 592 F.2d 1259 (5th Cir. 1979); Niedermeyer v. Commissioner,62 T.C. 280, 287 (1974), affd. 535 F.2d 500 (9th Cir. 1976). Nor did the redemption effect any change in the relationship among Texas Plastics shareholders. See Himmel v. Commissioner,338 F.2d 815, 817 (2d Cir. 1964), revg. 41 T.C. 62 (1963). We conclude, therefore, that when analyzed under section 302(b)(1), the redemption was essentially equivalent to a dividend to petitioner. Petitioner argues that a dividend was not intended. Section 302(d), however, provides that if a corporation redeems its stock and if, as we have concluded *374 above, section 302(a) is inapplicable, "such redemption shall be treated as a distribution of property to which section 301 applies." Section 301(a) [4] provides that a distribution of "property," which includes money under section 317(a), "made by a corporation [Texas Plastics] to a shareholder [petitioner] with respect to its stock" shall be treated as a dividend to the extent of the corporation's earnings and profits. The parties here agree that Texas Plastics had sufficient earnings and profits to support dividend treatment of the full amount of the $419,680. Treatment of that amount as a dividend is, therefore, required by the statute. *375 Section 316(a), [5] which defines the term "dividend," does not require that a corporation intend to pay a dividend or that a shareholder intend that the money he receives be a dividend. Rather, the section specifies that a dividend is "any distribution of property made by a corporation to its shareholders * * * out of earnings and profits." That was the source of the $419,680 distribution in this case. It was, therefore, a dividend. *376 Petitioner further argues that it would be wholly illegical to conclude that Texas Plastics' payment of $419,680 to petitioner for the 122,000 shares of stock was the payment of a dividend. Texas Plastics at that time was, in fact, trying to raise capital by arranging its affairs for a public offering of its stock and would not, in those circumstances, have intended to pay a dividend. In presenting this argument, petitioner misconceives the effect of section 302(b)(1). Whether Texas Plastics had the payment of a dividend as its "sole purpose" in redeeming some of the shares owned by petitioner is not the test for the application of the dividend equivalence test. Indeed, the Supreme Court in United States v. Davis,397 U.S. 301, 312 (1970), declared that the "'business purpose of a transaction is irrelevant in determining dividend equivalence' under section 302(b)(1)." See also Rose Ann Coates Trust v. Commissioner,55 T.C. 501, 514 (1970), affd. sub nom. Coates Trust v. Commissioner,480 F.2d 468 (9th Cir. 1973); Estate of Runnels v. Commissioner,54 T.C. 762, 765 (1970). As stated in Metzger Trust v. Commissioner,693 F.2d 459, 464 (5th Cir. 1982), *377 affg. 76 T.C. 42 (1981): Davis teaches that in applying the "essentially equivalent to a dividend" test * * *, if the resulting structure has virtually the same incidents of ownership the corporate payments distribute earnings despite an indisputable contrary business purpose. As we have discussed above, no significant change in the ownership of Texas Plastics occurred as a result of the redemption of the 122,000 shares of its stock from petitioner. The transaction's effect, although perhaps not intended as such, was nevertheless substantially equivalent to a dividend, and taxable as ordinary income. [6] Petitioner's principal argument, however, is that petitioner's exchange of Texas Plastics stock for the $419,680 payment was only one transitory step in a series of six interdependent steps culminating in a single transaction, i.e., the statutory merger of Texas Polymer into Texas Plastics, and that, because the six steps resulted in tax-free reorganization under section 368(a)(1)(A) [7], no gain or loss is to be *378 recognized as a result of the transaction here in issue. According to petitioner, the objective of the six-step process was to arrange Texas Plastics' ownership so that, when the surviving corporation's stock was eventually sold to the public, there would be little or no dilution in petitioner's majority control. The merger was also a part of an overall plan to simplify the organization and ownership of the many and far-flung Vahlsing family corporations. [8] Petitioner briefs the issue presented on the apparent understanding that the term "reorganization" as used in the Code is broad enough to include as a single reorganization the several mergers, consolidations, realignments, and readjustment of the large group of Vahlsing family corporations into four or five corporations, as well as a variety of related transactions. *379 As petitioner presents its case, the six steps in the merger of Texas Polymer into Texas Plastics were as follows: 1. On April 20, 1966, Texas Polymer issued 490,000 shares of its stock to Texas Plastics as part of the consideration for property known as the Mathis Plant. 2. On July 25, 1966, petitioner purchased from Texas Plastics the 490,000 shares of Texas Polymer stock for $490,000. 3. On July 22, 1966, petitioner also purchased 197,000-2/3 shares of Texas Plastics from F. H. Vahlsing (Texas) for $3.44 per share or an aggregate amount of $677,682.29, thus bringing petitioner's control of Texas Plastics' stock to 93.33 percent, as detailed in our findings. 4. On August 29, 1966, the transaction directly in issue occurred. Texas Plastics acquired 122,000 shares of its own stock from petitioner for an aggregate amount of $419,680, to be held "in treasury of the corporation for future possible needs." 5. On July 31, 1967, Texas Polymer was merged into Texas Plastics. 6. On August 2, 1967, petitioner purchased the remaining 26,219 shares of Texas Plastics treasury stock for the book value of $3.44 per share or a total of $90,193.36. As of the final *380 step, petitioner owned 91.48 percent of Texas Plastics' 345,583 issued shares. Petitioner's brief states: Since Texas Plastics, Inc. only had 27,594 shares of treasury stock on hand to effect the merger, it temporarily acquired the 122,000 shares of treasury stock on August 29, 1966 in step four to effect the merger in step five with "no dilution." As a result of step five, the transitory exchange transactions were completed and closed. The 490,000 and 25,000 shares of Texas Polymer Corporation stock temporarily acquired in step one and step two plus the 10,000 shares originally owned by F. H. Vahlsing, Sr. were exchanged for 123,375 shares of Texas Plastics, Inc. treasury stock of which 122,000 shares were temporarily acquired in step four. * * * Step four is not essentially equivalent to a dividend and it does not constitute "boot" in a plan of reorganization because step four was essentially an exchange transaction and The Christina Corporation [petitioner] had placed $160,512.26 more in the hands of Texas Plastics, Inc. than The Christina Corporation took back as a result of steps two, four, five and six in order to accomplish the merger of Texas Polymer Corporation *381 into Texas Plastics, Inc. with "no dilution." Petitioner adds: The merger of Texas Polymer Corporation into Texas Plastics, Inc. under the facts set forth in step five clearly met all of the requirements of the Internal Revenue Code of 1954 to qualify as a tax free reorganization under Section 368(a)(1)(A). The mere fact that the six steps transactions and their business purposes were not specifically included in the written plan of reorganization as defined in Section 368 is not a valid reason for totally disregarding the fundamental Federal income tax principles that it is substance and not the form of a transaction or series of step transactions which determines Federal income tax consequences.
Step four was not a separate independent transaction taken for the sole purpose of paying a $419,680 cash dividend to The Christina Corporation. The real substance of step four was to serve as a transitory exchange transaction to effect the statutory merger as described in step five and not for tax avoidance purposes. Petitioner invokes the step transaction doctrine and urges us to view the six steps outlined above not as separate transactions, but rather, as *382 interdependent steps resulting in a taxfree statutory merger under section 368(a)(1)(A). Petitioner maintains that, if the steps are collapsed, the net result is that petitioner transferred $580,193.36 ($490,000 on July 25, 1966 (step 2) and $90,193.36 on August 2, 1967 (step 6)) to Texas Plastics--$160,513.36 more than the $419,680 petitioner received from Texas Plastics in the transaction at issue--in order to effectuate the merger of Texas Polymer into Texas Plastics; thus, because petitioner transferred $160,512.26 more than it got back, petitioner argues that it cannot have received income, either ordinary or capital gain, in connection with the merger. [9]
We do not think that the step transaction doctrine is available to allow petitioner to escape taxation on its receipt of the $419,680 at issue under the facts of this case. In Lashar v. Commissioner,34 B.T.A. 768, 777 (1936), *383 we stated: We have held in a number of cases that not every transaction * * * which is provided for in an agreement embodying a plan of reorganization is to be treated for tax purposes as a part of a statutory reorganization. It is only those transactions which form an essential part of the reorganization that are to be so treated. * * * [Emphasis added.] See also International Telephone & Telegraph v. Commissioner,77 T.C. 60, 76 (1981), affd. per curiam 704 F.2d 252 (2d Cir. 1983). Petitioners have simply not convinced us that the redemption step was an essential part of the merger of Texas Polymer into Texas Plastics. Even if we assume that the six steps were taken to permit petitioner to control the surviving Texas Plastics, and that all six steps were part of petitioner's plan of reorganization as contemplated by petitioner, the redemption step, step 4, was not essential to the accomplishment of that objective. At the end of step 3, petitioner owned a controlling interest in Texas Plastics (296,798 of 317,989 shares (excluding treasury stock) or 93.3 percent) and in Texas Polymer (490,000 of 525,000 or 93.3 percent). Had Texas Polymer *384 been merged into Texas Plastics at that point, it is apparent that petitioner would have owned 93.3 percent of the surviving corporation. Petitioner's explanation of the purpose of the redemption of the 122,000 shares is not convincing. Petitioner states and reiterates that: "Under the Plan of Merger, Texas Plastics, Inc. could only exchange its treasury stock for 525,000 shares of Texas Polymer Corporation common stock owned by The Christina Corporation [petitioner] and F. H. Vahlsing, Sr. if 'no dilution' was to occur." We have examined the plan of merger of Texas Polymer into Texas Plastics, however, and we can find no reference to the redemption by Texas Plastics of any of its stock or to any requirement that petitioner's Texas Polymer shares be exchanged for treasury stock. [10] Nor do we see how, as petitioner emphasizes, an exchange on that basis protected petitioner against dilution of its interest in Texas Plastics. To the contrary, had petitioner retained the 122,000 shares of Texas Plastics stock that were redeemed and, as a result of the merger, received newly issued stock in the surviving corporation for its 490,000 Texas Polymer shares, it would *385 have had 122,000 more shares in the surviving corporation that it did under what petitioner now says was the reorganization plan. *386 We are not convinced that the real purpose of step four (the redemption by Texas Plastics of the 122,000 shares of its stock) was not to recoup for petitioner some of the cash it had expended in these transactions. Petitioner had only recently paid $490,000 to Texas Plastics for its Polymer stock and $677,682.29 to F.H. Vahlsing, Inc. (Texas) for some Texas Plastics stock. We are not satisfied that the redemption was not used as a means of replenishing petitioner's cash reserve. Otherwise, we have no explanation of either the timing of the redemption or the failure to use unissued stock in the exchange for petitioner's Texas Polymer shares. In sum, we conclude that the redemption, carried out almost a full year before the merger, must be viewed as a transaction separate from the merger and that it was a transaction which independently gave rise to the tax consequences as determined by respondent. As to the personal holding company tax determined by respondent, petitioner's only argument in this regard is that-- respondent's computation of the percentage of personal holding company income received by the petitioner * * * erroneously includes $419,680.00 of dividend income *387 which is in controversy before the Court on whether the transfer of 122,000 shares of Texas Plastics, Inc. stock * * * was essentially equivalent to a dividend. Because we have concluded above that the $419,680 is taxable to petitioner as ordinary income, we sustain respondent's determination with respect to the imposition of the personal holding company tax in the absence of any other evidence from petitioner tending to show that respondent's determination is erroneous. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
1. Vahlsing Foundation, Inc., was a charitable foundation controlled by Vahlsing family members. Margaret Schenk is the daughter of F.H. Vahlsing, Sr.↩
2. SEC. 317. OTHER DEFINITIONS. (a) Property.--For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock). (b) Redemption of Stock.--For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.↩
3. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule.--If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), or (3) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges.-- (1) Redemptions not equivalent to dividends.--Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. (2) Substantially disproportionate redemption of stock.-- * * * (3) Termination of shareholder's interest.--Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder. * * * (d) Redemptions Treated as Distributions of Property.--Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.↩
4. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.↩
5. SEC. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.↩
6. In the notice of deficiency, respondent allowed petitioner the 85-percent dividends-received deduction under sec. 243(a)(1).↩
7. At trial, petitioner's emphasis was placed almost exclusively on the theory that the overall transaction was a recapitalization under sec. 368(a)(1)(E). In petitioner's brief in reply, petitioner concedes that the transaction here in issue was not a sec. 368(a)(1)(E) reorganization. ↩
8. At one point in the trial, respondent's counsel raised a question as to the use by witness Fred H. Vahlsing, Jr., of the word "reorganization," and the Court stated: If I understand his testimony [that of Fred H. Vahlsing, Jr.], it is, that he looks at a broad picture of all of the corporations owned by the Vahlsing Family. The grand design is to eliminate as many corporations as possible and end up with 4 or 5 corporations, which is ultimately what they did. As I understand it, that is what he refers to as the plan of reorganization * * * is that correct? Mr. Vahlsing answered "yes," and petitioner reiterates that position. On brief, petitioner states that Mr. Vahlsing used the words "plan of reorganization" as an ordinary layman would and identifies F.H. Vahlsing, Inc. (Texas), and F. H. Vahlsing, Sr., who owned some of Texas Polymer's stock, as well as Texas Plastics and Texas Polymer, as parties to the reorganization.↩
9. We note that upon completion of the six steps, petitioner owned 141,369 more shares (115,150 shares received in the merger in exchange for Texas Polymer stock plus 26,219 shares from Texas Plastics' treasury) of the stock of the surviving Texas Plastics than it would otherwise have owned.↩
10. The plan of merger states that Texas Plastics is authorized to issue 1,000,000 shares of common stock of which 195,989 are issued and outstanding, not including 149,594 shares held in the treasury. The plan provides: The manner and basis of converting the outstanding shares of Polymer into shares of stock of the surviving corporation are as follows: Every share of the capital stock of Polymer issued and outstanding when the merger becomes effective and all rights in respect thereof shall be exchanged for and converted into .235 fully paid and nonassessable shares of the Common Stock, par value $2.00, of the surviving corporation; and each holder of said capital stock of Polymer upon presentation and surrender to the surviving corporation of his stock certificate or certificates shall be entitled to receive in exchange therefor certificates representing shares of the Common Stock of the surviving corporation on the basis herein provided. * * * The Texas statutes permitted treasury stock to be disposed of by Texas Plastics "for such consideration as may be fixed from time to time by the board of directors"; par value shares never issued could be disposed of for not less than fair market value. Vernon's Texas Stats. Ann., Bus. Corp. Act, Art. 215A and C. This added flexibility for treasury stock provides no reason for the use of treasury stock to acquire petitioner's Texas Polymer shares because the price of $3.44 per share as well as the subsequent public offering price exceeded the $2 per value of the Texas Plastics stock.↩